IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

```
- - - - - - - - - - - - - - - x
                                :
UNITED STATES OF AMERICA,       :
                                :
      v.                        :    Criminal No. 18-02652-JMC
                                :
BILAL SIDDIQUI,                 :
                                :
          Defendant.            :
                                :
- - - - - - - - - - - - - - - x    October 15, 2018
```

Baltimore, Maryland

**DETENTION HEARING**

BEFORE:   THE MAGISTRATE JUDGE STEPHANIE A. GALLAGHER

APPEARANCES:

JEFFREY J. IZANT, Esq.
PAUL E. BUDLOW, Esq.
Office of the United States Attorney
36 South Charles Street, 4th Floor
Baltimore, Maryland 21202
   On Behalf of the Government

ANDREW R. SZEKELY, Esq.
Office of the Federal Public Defender
100 South Charles Street
Tower II, Suite 900
Baltimore, Maryland 21201
   On Behalf of the Defendant

Audio Operator:        Jill Waryu

Transcription Company: CompuScribe
                       5100 Forbes Boulevard
                       Suite 101
                       Lanham, Maryland 20706
                       (301)577-5882

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

dmh

2

## I N D E X

Page

Statement of the Facts

  By Jeffrey Izant, Esq.
  Attorney for the Government      3

Risk of Non-Appearance and
Dangerousness to the Community

  By Andrew Szekely, Esq.
  Attorney for the Defendant      12

  By Paul Budlow, Esq.
  Attorney for the Government      20

  Rebuttal by Andrew Szekely, Esq.      24

  Rebuttal by Jeffrey Izant, Esq.      27

  Surrebuttal by Andrew Szekely, Esq.      27

Findings by Magistrate Judge Gallagher      28

KEYNOTE:   "*"   indicates phonetically spelled in transcript.

dmh

3

1      P R O C E E D I N G S

2          (Whereupon, at 10:04 a.m., the proceedings began.)

3          THE CLERK:  All rise.  This Honorable Court is now

4    in session.  The Honorable Stephanie A. Gallagher presiding.

5          THE COURT:  Good morning.  Please be seated.

6          MR. IZANT:  Good morning, Your Honor.  Calling the

7    case of United States of America versus Bilal Siddiqui, Case

8    No. 18-2652-JMC.  On behalf of the United States, I am

9    Assistant U.S. Attorney Jeff Izant and with me at counsel

10   table is FBI Task Force officer Joshua Reese*.

11         Good morning, Your Honor.  We are here for a

12   detention hearing.

13         THE COURT:  All right.  Thank you.  Good morning.

14   Mr. Szekely.

15         MR. SZEKELY:  Good morning, Your Honor.  Andrew

16   Szekely on behalf of Mr. Siddiqui and we are also joined by

17   his parents, Mr. and Ms. Siddiqui, who are seated behind me

18   here today.

19         THE COURT:  All right.  Thank you.  All right.  Are

20   we ready to proceed then?

21         MR. SZEKELY:  Yes, Your Honor.

22         MR. IZANT:  I believe we are.

23         THE COURT:  All right.  Mr. Izant.

24         MR. IZANT:  Your Honor, the Defendant has been

25   charged in a criminal complaint with sexual exploitation of a

1   child in violation of 18 U.S.C. Section 2251(a).  As Your

2   Honor knows, this is an extremely serious charge and it

3   carries a mandatory minimum term of incarceration of 15 years.

4        It is also an extremely serious charge under the

5   Bail Reform Act because that Act provides under Section

6   3142(e)(3)(e) that this Court must presume no condition or

7   combination of conditions will reasonably assure the safety of

8   the community if it finds probable cause to believe that the

9   Defendant committed the charge involving a minor.

10        And I note for the record that I am joined at

11   counsel's table by AUSA Paul Budlow.

12        MR. BUDLOW:  Good morning, Your Honor.

13        THE COURT:  Good morning.

14        MR. BUDLOW:  I apologize for late.

15        THE COURT:  No problem.

16        MR. IZANT:  So this morning, Your Honor, I want to

17   focus on the two most important factors under Section 3142(g)

18   that explain why the Government is seeking detention of this

19   Defendant and those are the nature and circumstances of the

20   offense and the weight of the evidence against the Defendant.

21        So as to the nature of the offense, the conduct

22   began prior to September 2017 when the Defendant created a

23   fake account on LiveMe which is an app that allows users to

24   broadcast live video over the Internet and chat with those who

25   are viewing.

5

1     The Defendant's account was fake because he selected

2 as a profile picture a photograph of a young man so that users

3 would not recognize him as a 20 or 21-year-old.

4     One of those users was a then 8-year-old girl

5 identified in the complaint as Jane Doe 1.  And on or about

6 September 28th, 2017, Jane Doe 1 was using LiveMe to broadcast

7 a video of herself working out while she was wearing her

8 pajamas.

9     The Defendant was watching this broadcast and it was

10 open to the public.  When a number of viewers asked her to

11 show them her underwear, she refused and stated it would make

12 her cold and eventually she ended the broadcast.

13     But when she started a new broadcast, the Defendant

14 and other viewers followed her to that new video and again

15 began asking her to undress.

16     The Defendant himself specifically asked her to take

17 off her shirt, to bend over and to show her behind.  And while

18 Jane Doe 1 initially refused these requests, she eventually

19 did what her viewers asked because in her words she told

20 investigators she wanted to be cool and popular.

21     And eventually the Defendant convinced Jane Doe 1 to

22 end her live video broadcast and engage directly with him via

23 text message and FaceTime which is Apple's video chat

24 application.

25     So the Defendant and Jane Doe 1 communicated through

1   several FaceTime video chats that same night and although she

2   was actually 8 years old, she told the Defendant that she was

3   13.

4         Nonetheless, during these chats the Defendant

5   instructed her to remove her pants, her underwear and her

6   shirt and her genitalia were visible to him.  The Defendant

7   also instructed her to use a marker to write his first name on

8   her skin next to her genitalia.

9         The Defendant also instructed Jane Doe 1 to use the

10   bathroom so he could watch her urinate.  And, finally, the

11   Defendant asked her to send him pictures of herself and her

12   genitalia.  She did send the Defendant at least one picture of

13   herself and in that picture her legs were spread exposing her

14   vagina and her left hand is touching her vagina and spreading

15   it open.

16         The Defendant then asked Jane Doe 1 to delete the

17   pictures and their conversation from her electronic device.

18         So that is the nature of the conduct that is charged

19   in the complaint.

20         As far as the weight of the evidence is concerned,

21   the evidence of the Defendant's guilt is overwhelming.  The

22   investigation began when the Defendant's conduct was noticed

23   by an online watchdog group that reported a group of users

24   sexually exploiting Jane Doe 1.

25         And the group even provided law enforcement with a

1    screenshot of the Defendant's profile asking Jane Doe 1 to

2    bend over and show her behind.

3            Jane Doe 1 was then interviewed by law enforcement

4    and confirmed all the conduct that I have described including

5    that the Defendant followed her from one stream to another,

6    began communicating with her directly on FaceTime and Messages

7    and asking her to write on herself and take pictures of

8    herself and send them to him.  And she also confirmed that she

9    told the Defendant she was 13.

10           Jane Doe 1's IPad that she used to communicate with

11   him was forensically examined and investigators recovered a

12   September 28th, 2017 text message conversation between that

13   IPad and the Defendant's phone number and that is the

14   conversation in which she sent the image that I described

15   earlier.

16           T-Mobile then confirmed that that phone number was

17   subscribed to by a customer residing at the Defendant's

18   address in Kingsville, Maryland and LiveMe was also

19   subpoenaed.  In response to that subpoena, investigators

20   confirmed that the IP addresses used to log into the

21   Defendant's LiveMe account were maintained by a Verizon

22   customer at the Defendant's address.

23           That profile was logged into on numerous occasions

24   between July 20th, 2017 and September 29th, 2017 and that

25   profile was logged into from those IP addresses, tied to the

1   Defendant's residence also between April 24th, 2018 and July

2   11th, 2018.

3          In response to the subpoena, LiveMe also provided

4   three of the videos that it had saved on its platform.   In

5   each of those videos Jane Doe 1 is heard stating that she is

6   13 years old and in the second and third videos Jane Doe 1

7   exposes her vagina to the camera in a manner that makes it the

8   focal point of the video.

9          In response to directions from viewers who were

10  messaging her, she touches her chest and genitals and uses her

11  fingers to spread her vagina.   And at the end of the third

12  video, Jane Doe 1 can be heard stating that she is ending the

13  broadcast so that she could speak privately to the Defendant.

14         And from Jane Doe 1's account LiveMe also produced a

15  conversation in which the Defendant's profile asks Jane Doe if

16  she has SKYPE and after she says that she does not, he

17  instructs her to text him.

18         And so then on the basis of this information,

19  investigators obtained a search warrant for that house that

20  was tied to the T-Mobile cell phone account as well as the

21  logins to LiveMe.

22         During the search the Defendant waived his Miranda

23  rights and consented to an interview that was audio recorded.

24  And during that interview he made the following admissions.

25         He confirmed that his phone number was the one that

1   communicated with Jane Doe 1.  That it was passcode protected

2   and that no one else in the home used it.  He admitted that he

3   used the LiveMe app.  That it was installed in his phone as

4   they spoke and that he had created a fake profile that he had

5   used to communicate with Jane Doe 1 using a picture of a high

6   school classmate to disguise his identity.

7        He also acknowledged communicating with Jane Doe 1

8   on LiveMe and directing her to pull her pants down and show

9   her genitalia to the camera.  He further admitted that he

10  communicated with Jane Doe 1 by text message and FaceTime

11  including that he asked her to record herself urinating.

12       That he asked her to send nude images of herself by

13  text message.  That she did so and that he asked her to delete

14  the images and their conversation afterward.  And the

15  Defendant also stated that he believed Jane Doe 1 was 13 years

16  old.

17       I also want to mention danger to the community more

18  broadly under Subsection (g)(4).  The Defendant's conduct was

19  not actually limited to the events that I have described that

20  took place on September 28, 2017 because during their on-scene

21  review of the Defendant's IPhone investigators also discovered

22  evidence that he had sexually exploited another minor female,

23  specifically, one that I will refer to as Jane Doe 2 who

24  investigators located videos of on the Defendant's phone

25  engaging in sexually explicit conduct including videos

dmh                                                                    10

1    depicting her touching her vagina with her hands, inserting

2    objects into her vagina and writing on herself with a marker.

3            The Defendant was also asked about these videos

4    which came to light during his interview and he admitted that

5    he instructed Jane Doe 2 to touch herself and to insert a

6    hairbrush into her vagina.

7            The Defendant also admitted that he instructed her

8    to write Bilal, his first name, B-i-l-a-l, in marker on her

9    pubic area and that he had done the same thing with Jane Doe

10   1.

11           The Defendant further stated that although Jane Doe

12   2 told him she was between 14 and 16 years old, he actually

13   believed that she was 11 or 12 years old and that is the same

14   age as his youngest sister.

15           The Defendant stated that he began communicating

16   with Jane Doe 2 on Snapchat and that he created the videos of

17   her by using the screen record function on his IPhone and he

18   estimated that he had 10 videos of this child on his phone.

19           The Defendant also stated that he began

20   communicating with Jane Doe 2 in August of 2018 and that he

21   had communicated with her as recently as two days before the

22   interview.

23           And it is clear that all of the conduct I have just

24   described, it only represents the tip of the iceberg because

25   although a forensic review, a complete forensic review of the

dmh                                                                          11

1  Defendant's IPhone is not yet complete, the Defendant admitted

2  that he has a sexual interest in children and he was asked how

3  many minors he thinks he has engaged to produce sexually

4  explicit videos and he stated that the number was more than 10

5  but not as many as 50 so somewhere in that range.

6            I also just want to briefly address the proposed

7  third party custodian.   It is the Government's understanding

8  that the Defense would propose that the Defendant, upon

9  release, live with his father at an address -- at an apartment

10 separate from the family home where the 11-year-old lives in

11 Windsor Mill, Maryland and I am not sure right not because I

12 just got this information how far that is from the family home

13 but the Government's view is that there is no condition or

14 combination of conditions short of 24/7 surveillance of this

15 Defendant and surveillance specifically of his access to

16 electronic devices and the Internet that would protect the

17 community from him.

18           And this proposed arrangement is inadequate in our

19 view because the Defendant's father works full-time, 8:00 a.m.

20 to 4:00 p.m., Monday through Friday and cannot possibly be

21 expected to supervise the Defendant as the Government

22 indicates is necessary.

23           And so given that inadequacy, given the

24 dangerousness the Defendant represents particularly through

25 electronic communication, the nature of his conduct and the

1  weight of the evidence against him, the Defense cannot rebut

2  the presumption that he should be detained.   Thanks.

3          THE COURT:   Thank you.   Mr. Szekely.

4          MR. SZEKELY:   Thank you, Your Honor.   Just to be

5  clear, is the Government moving solely on dangerousness and

6  not moving on risk of non-appearance?

7          MR. IZANT:   I did not address risk of non-appearance

8  but I would point out that Probation acknowledges there is

9  some risk due to the Defendant's familial ties in I believe

10  India or Pakistan and his possession of a U.S. passport.

11          THE COURT:   Thank you.   Mr. Szekely.

12          MR. SZEKELY:   Thank you, Your Honor.   Let me briefly

13  address risk of non-appearance then.   I do not think that is a

14  serious risk in this case.   Mr. Siddiqui was born in the

15  United States.   He has lived here his entire life.   His entire

16  immediate family, most of his extended family is here.

17          To the extent that the Court feels the passport is a

18  concern, of course, we would be -- have no objection to

19  surrendering that passport here but his entire life here is in

20  the Baltimore area so I do not believe that risk of non-

21  appearance is an issue here.

22          So what we are really talking about is

23  dangerousness.   The Government correctly notes that this is a

24  presumption case but, of course, the presumption does not

25  shift the burden off of the Government to show by clear and

dmh                                                                              13

1   convincing evidence that Mr. Siddiqui must be detained.

2          The presumption merely requires us to produce some

3   evidence and the burden is extremely slight on the Defense in

4   this respect that he is not a danger to the community.

5          To that regard, Your Honor, I will point the Court's

6   attention first to Defendant's Exhibit B which I believe the

7   Court should have a copy of.  It is a letter from Baltimore

8   County's Pretrial Services.

9          I will preface this by saying, of course, the

10  charges were different in the State, the degree of supervision

11  in the State was different but I will note the State bail

12  statute is remarkably similar to the Bail Reform Act in terms

13  of what is to be considered before release but, of course,

14  that is not binding on this Court in any way.

15         But what is relevant I believe to rebutting the

16  presumption is that Mr. Siddiqui was arrested by Federal

17  authorities on September the 6th of 2018.

18         The Federal authorities arrested him and rather than

19  coming down to this courthouse and obtaining a complaint, he

20  was turned over to the State for charge and detention.  I will

21  note that this complaint was not issued until September the

22  26th.

23         Now, the Government is within its right to determine

24  how to proceed with the case so maybe there was a reason it

25  went to the State authorities first.  But certainly they must

1   have been aware that Mr. Siddiqui was released upon

2   presentment and determination of whether release was proper in

3   the State system and he remained on release for three weeks.

4           He completely complied with the conditions as seen

5   here but what is more I think relevant is the Government knew

6   he was out in the community for that period of time and they

7   did not go out the next day and essentially say, well, we know

8   this guy is out there.  He is an ongoing danger to the

9   community.  We cannot leave him out there.  We need to go pick

10  him up right now.

11          And, again, this is not a situation where sometimes

12  the case is charged by local authorities and it takes some

13  time to screen a case and make that determination.  This was a

14  case that was a Federal investigation and Mr. Siddiqui was

15  home and in the community without incident for three weeks.

16          So I think that in and of itself is enough to rebut

17  the presumption and the fact that he was out without incident

18  in the community also shows that there are conditions that can

19  be set because conditions were set.  He complied with those

20  conditions.  There is no indication he violated those

21  conditions.

22          So the Court already has a track record of the

23  conditions and we agree in this case, Your Honor, for purposes

24  of this Court, the conditions should be stricter and I will

25  get to what our proposed conditions for release are in a

1  moment but I do think Mr. Siddiqui has effectively rebutted

2  the presumption so the burden is back squarely on the

3  Government.

4           In terms of the Bail Reform Act factors to consider

5  this is a serious offense, Your Honor.  I do not think there

6  is any question.  We are certainly not going to sit here and

7  suggest otherwise or stand here and suggest otherwise.

8           But what is missing from this case that is present

9  in I think too many of these cases are aggravating facts such

10 as attempts to meet the minors, attempts to find out where the

11 minor lives, threats to the minor.

12          None of those seem to be present in this case so

13 while the evidence, assuming the Government -- I do not have

14 discovery yet, taking the Government's proffer at its face

15 value, while the evidence does seem to be strong and does seem

16 to present seriousness, it lacks many of the aggravating

17 factors we find in these cases which would suggest an ongoing

18 danger to the community.

19          In terms of the actual factors looking to the Bail

20 Reform Act, clearly Mr. Siddiqui has no criminal history.  He

21 has no history of drug or alcohol use.  He received one drug

22 test at the time of his arrest and that came back negative.

23          He is in many respects a model young man.  I mean

24 this is serious conduct, Your Honor, and we are going to

25 address it as it comes but he prior to this was 21 years old.

1    He was a full time student at UMBC.  He worked two different

2    jobs to help pay -- help defray his costs.

3         His parents have told me that he engaged in

4    community activities, religious activities with his family.

5    This is an individual who has strong ties to this community,

6    his family has strong ties to this community.

7         Certainly, if the Court were to release him, we

8    would think some sort of mental health evaluation treatment

9    would absolutely be an appropriate condition, Your Honor, not

10   only because of the nature of these charges but, of course,

11   the anxiety and stress that accompanies a serious charge like

12   this, that mental health treatment would be appropriate both

13   for Mr. Siddiqui as well as to the Court's assurance that

14   Mr. Siddiqui is complying with conditions.

15        Your Honor, in terms of ongoing danger to the

16   community, if the Court were to issue a release order in this

17   case for 24/7 location monitoring with permission to leave the

18   house for medical.

19        Mr. Siddiqui has sort of a non-serious but

20   nevertheless ongoing eye condition that he has been seeing an

21   ophthalmologist for so 24/7 release except for -- sorry,

22   detention except for approved medical visits, court hearings,

23   attorney meetings and he has asked me if he could be permitted

24   one religious -- a trip to the mosque every Friday with his

25   father to pray.  To permit that as well as part of a condition

1   of release where he would be accompanied by his father to the
2   mosque.

3         In terms of the third party custodian, Your Honor,
4   when this case came in on September the 27th, Pretrial -- I
5   think it was Ms. Sanger was present that day as well --
6   flagged for us the issue of a minor child in the home and the
7   inappropriateness of him living there.

8         During the pendency of the State case, Mr. Siddiqui
9   lived with a great aunt and great uncle who have grown
10  children and no grandchildren regularly in the house.  He
11  lived there.

12        After talking with them, they were not prepared
13  to -- they were fine with the third party condition things but
14  they were concerned about how long the case might go on and
15  they were not certain they wanted Mr. Siddiqui there for that
16  long as well as they had plans to travel abroad at some point
17  so they were concerned that that would be a problem.

18        So when I spoke with his family and Defendant's
19  Exhibit A to this is a lease, Your Honor.  It is 45 Tavel*
20  Mill Court in Windsor Mill, Maryland.

21        What Mr. Siddiqui's father has done, Rafea*
22  Siddiqui, is he has gone out and rented an apartment, I think
23  it is a townhome actually, for the two of them to live in
24  together during the pendency of this case.

25        On page 1, paragraph 2, I will note that the family

1   is committed to pay $16,200 in rent over the course of the

2   next year.  That is a substantial financial commitment the

3   family is putting forward.  I will note on page 2, the two

4   individuals listed on the lease are father and son.

5          In terms of how close it is to the family's

6   residence, they are both in Baltimore County, Your Honor, but

7   the entire purpose of this was to provide a place where

8   Mr. Siddiqui could live with a responsible adult that is

9   outside of the family home where there are no minor children

10  around to satisfy the Court's concerns if he was living with a

11  minor child.

12         You know, in terms of the Government's concerns that

13  Mr. Siddiqui works.  I am sometime at a loss when it comes to

14  that argument, Your Honor, because if we come in with a third

15  party custodian who does not work, the Government is concerned

16  that the person is not a responsible citizen and they do not

17  work.

18         If we come in and say we have a third party

19  custodian who works, they are out of the house too much and

20  they cannot possibly provide the necessary supervision.  I do

21  not know how we can possibly win in the eyes of the Government

22  in terms of third party custodians but Mr. Siddiqui, the

23  father here, he works.  He is a responsible member of the

24  community.  It is a family that has strong ties to their

25  community as well as to Baltimore County, their immediate

1  community of their friends and neighbors and family members as

2  well as here in the community.

3          He is in many ways I think a third party custodian

4  the Court can rely on.  I know that he and I have spent many

5  hours I think in the past two weeks on the phone talking about

6  the case, talking about the rules.  There is no question in

7  the minds of Mr. Siddiqui, our proposed third party custodian,

8  regarding the seriousness of this offense.

9          He and my client both understand the stakes here.

10  They understand what the charges are but, nevertheless, if the

11  Court is concerned about is Mr. Siddiqui an ongoing threat,

12  certainly living in a house with no computer.  If there is a

13  cell phone, it is only Mr. Siddiqui, the father's.  He would

14  take it with him when he leaves.  It is password protected

15  when he is there.

16          The Court can certainly fashion other conditions.

17  Mr. Siddiqui has been a student.  He and I met.  He

18  understands at least for now he is not returning back to

19  school.  That was already I think a sort of serious

20  consequence of his behavior in this case is him having to

21  withdraw from school under these sort of dubious

22  circumstances.

23          If I may have the Court's indulgence, Your Honor, to

24  look down at the other factors?

25          In terms of community ties, I mean every factor in

1    terms of character of the individual weighs in favor of

2    release.  The Court in this case should grant a release order

3    and I would just finally, again, conclude with noting that

4    Mr. Siddiqui was released for a number of weeks.  He complied.

5    He has shown to not be a danger to the community.  He has no

6    criminal history whatsoever.

7              And for those reasons, Your Honor, I would ask the

8    Court to issue a release order to permit Mr. Siddiqui to be

9    released to the community under the strict conditions that we

10   have suggested to the Court while this case is pending.

11             THE COURT:  All right.  Thank you, Mr. Izant or

12   Mr. Budlow?

13             MR. BUDLOW:  Your Honor, I am going to briefly

14   respond primarily because one of the issues that was raised I

15   think is something that is sort of squarely in my court I

16   guess if you will as you will see momentarily.

17             THE COURT:  Can I ask you -- excuse me, Mr. Budlow,

18   can you put the microphone towards you?

19             MR. BUDLOW:  Yes, sur.

20             THE COURT:  Thank you so much.

21             MR. BUDLOW:  Just three issues that I want to

22   discuss.  First of all, with respect to the third party

23   custodian, Mr. Szekely raises a good point.  If we required

24   every third party custodian to be both a responsible

25   individual and someone who is home all the time, there would

1   be very few people who were released to third party custodians

2   with the caveat in cases this serious and I agree with him.

3   It puts them in a tough situation to find someone that

4   appropriate but here what we are talking about is not just a

5   presumption case but a very serious case where the Government

6   thinks detention is the only appropriate situation.

7           Where they want to say, let's find a third party

8   custodian in lieu of that that will deal with the danger that

9   the Defendant represents.  In an electronic evidence, Internet

10  based case, there are situations that I have seen where there

11  has been a third party custodian who happens to be a retiree

12  or is home full time for whatever reason.  That does happen.

13          I would just ask the Court to take it on a case-by-

14  case basis.  Do not look at how this case would apply to other

15  cases.  Look at the facts of this case, this Defendant's risk

16  of harm and that is why the Government believes that, one,

17  there really is no combination but if there were to be a third

18  party custodian, it would need to be somebody who is with him

19  pretty much all the time in lieu of being in jail where

20  someone is with him all of the time.

21          The second point is that Defense points out that

22  this case isn't as bad as some others we see.  I mean the

23  Defendant is very young and the Defendant has zero criminal

24  history.  The youth part is a little unusual I will admit for

25  Federal Court.  The zero criminal history part is typical.

dmh                                                                        22

1          The conduct is awful.  It isn't less than what we
2   see.  I do have a sentencing this afternoon that may be is
3   worse than this case but what Your Honor has seen and what I
4   have seen is that minors who are exploited online in the way
5   that these minors were exploited online suffer extremely
6   serious long-term psychological impact sometimes and often as
7   bad as individuals that are harmed in person but it is
8   certainly close and it is not significantly different enough
9   that I would stand up in court and say this is less serious
10  enough that release would be appropriate.

11          I mean we are talking about an 11 and an 8-year-old
12  that did really unspeakable things to themselves at his
13  instruction including inserting a hairbrush into her vagina.
14  I mean this is stuff that is not going to go away and is going
15  to have a really serious impact.

16          And then the last point I want to address is the
17  delay.  And I guess the relevance of the Defendant's argument
18  that there was the delay between the Defendant's release from
19  State Court on September 7th and his arrest in this case on I
20  think it was the 26th of September so a couple of weeks later
21  is -- and I am not going to put words in his mouth but I have
22  heard it in other cases.

23          Maybe there is an inference that the Government does
24  not really think there is that much of a threat or why would
25  they let the Defendant sit out so long?

1          Two points.  One, it is really not that long.  I

2   have certainly seen cases where there has been a much longer

3   delay as a result of additional investigation that was needed

4   or follow-up forensics or interviews, whatever.

5          In this case I will say that the clear reason for

6   the delay was a communication breakdown and I will just very

7   briefly tell Your Honor, I was the AUSA in Baltimore that was

8   screening this case.  It came from a referral from Texas to

9   the FBI and to Baltimore County, a task force officer.

10         There was an investigation.  The search occurred and

11  I was the point person in determining whether or not this case

12  was going to be a state case, a Federal case in Texas or a

13  Federal case in the District of Maryland.

14         At the time of the search warrant that decision was

15  not made but, of course, when possible there is always state

16  charges put in place.  Without a doubt the investigators knew

17  that the Defendant was released, both State and Federal.

18         I was made aware of that at some point within the

19  first couple of days and all I can tell Your Honor is that

20  there was a communication breakdown that ultimately prior to

21  today I took responsibility for.

22         Once we figured out or I sort of was alerted again

23  as to what was going on, we acted quickly, within days, got a

24  complaint and an arrest warrant and here we are.

25         So if there is some other basis for that delay, that

dmh                                                                    24

1   maybe there is an appropriate inference, I do not think that

2   the inference should be that as a result of that two and a

3   half week delay, the Government does not really think the

4   Defendant is a harm.  I do not think anything should be drawn

5   from that.

6               THE COURT:  Okay.

7               MR. BUDLOW:  Unless Your Honor has any further

8   questions for the Government, that is all I have.

9               THE COURT:  No, I think that is it.

10              MR. BUDLOW:  Thank you.

11              THE COURT:  All right, thank you.  Any response,

12  Mr. Szekely?

13              MR. SZEKELY:  Your Honor, yes, two brief responses,

14  Your Honor.  Thank you for the opportunity.  The first is the

15  Government's point about the impact on the victims is well

16  taken and what I meant by in terms of certain aggravating

17  factors being absent remains true that there are cases where

18  the fact that a person on the other end of the chats, the

19  Defendant has tried to get the home address of a person he was

20  chatting with, has further distributed pictures, has made

21  threats, if you don't send me more pictures, I will further

22  distribute them.

23              Those are all absent here.  What the Government says

24  about victim impact I think is relevant and I am sure if this

25  case proceeds to a sentencing we will get victim impact and

dmh
25

1    the victim impact is always powerful and quite effective in

2    these cases but in terms of Mr. Siddiqui being an ongoing

3    danger to those identified victims, those factors are not

4    present in this case.

5            And in terms of the timing, Your Honor, you know,

6    communication breakdown notwithstanding, Mr. Siddiqui was in

7    the community for three weeks.  He was in the community

8    without incident.  He could have been arrested and brought to

9    this courthouse on a placeholder complaint just as easily as

10   he was brought to the state authorities on a placeholder

11   statement of charges and he was not.

12           So I do think the fact that he was on release for a

13   number of weeks is relevant in terms of looking at his danger

14   to the community.

15           Whether the Government agrees or not, the Court can

16   certainly look at his being in the community for a number of

17   weeks and find that, certainly, he was not a danger then.  He

18   complied with conditions and he will continue to do so going

19   forward.

20           For those reasons, Your Honor, I would ask the Court

21   to issue a release order for Mr. Siddiqui on the conditions

22   that we have submitted to the Court and if there is any other

23   conditions the Court thinks are appropriate, of course, we

24   will comply with those.  We would be happy to discuss

25   additional conditions the Court may wish to brainstorm about

dmh                                                                      26

1   that could keep Mr. Siddiqui in closer supervision going

2   forward.

3              THE COURT:  Thank you.

4              MR. SZEKELY:  Actually, Your Honor, may I speak with

5   the family for one moment?

6              THE COURT:  Sure.

7              (Pause.)

8              MR. SZEKELY:  Your Honor, one matter and this just

9   came up in light of the Government.  His mother, Shema*, is

10  here as well.  She is not employed outside the home and she

11  has indicated a willingness to go to the house while

12  Mr. Siddiqui is at work to remain with Mr. Siddiqui, Bilal

13  Siddiqui, to make sure there is a responsible adult in the

14  house.

15             She was not previously listed as a party custodian.

16  I think she was on the initial pretrial report, Your Honor,

17  and she, again, is an individual who has no prior criminal

18  record and would be appropriate.

19             So we could arrange it.  It would be, of course, the

20  family -- again, an indication, again, of the family's

21  willingness to take this matter seriously.  She would be

22  willing to remain at the house during the day while

23  Mr. Siddiqui is at work to make sure that her son is

24  accompanied and monitored during the day if the Court feels

25  that is -- we do not think that is strictly necessary but,

1    certainly, the family is going to do that.  So we would be

2    willing to -- the family would be willing to consider sort of

3    having -- Mr. Siddiqui would reside there and Ms. Siddiqui

4    would be present during the day when Mr. Siddiqui is at work.

5              THE COURT:  Anything you want to say, Mr. Izant?

6              MR. IZANT:  Your Honor, we still are not comfortable

7    with that arrangement particularly because it raises more

8    questions than it answers.  In that case who is going to be

9    responsible for the 11-year-old?  How is this going to work

10   logistically?  It is just too tenuous for us to be comfortable

11   with release under those conditions especially in light of

12   everything else we have discussed.

13             MR. SZEKELY:  Your Honor, very briefly.  There are

14   two adult children that live in the home.  They would make

15   sure the 11-year-old got to school and didn't -- and, frankly,

16   the family logistics are of concern to the Siddiquis and if it

17   turns out that he is not supervised as the Court wants, well,

18   that is clearly a violation.  The Court has ways of monitoring

19   that.

20             I appreciate the Government's concern for how it is

21   not, frankly, that tenuous.  One parent leaves, the other

22   parent arrives.  If for any reason Pretrial does a random

23   check or any of those things where they call the house, see

24   who is there, no one is there, that is a violation.  There

25   will be a Pretrial violation warrant I think immediately.

dmh                                                                    28

1          So I do think it is -- again, I do not think it is

2   strictly necessary to have Ms. Siddiqui in the home but the

3   family is willing to do that if that is something that the

4   Court feels is appropriate.

5              THE COURT:   Okay.   Thank you.

6              (Long pause.)

7              THE COURT:   All right.   I thank both counsel for

8   their presentations in this case.   I am issuing an order of

9   detention in this matter and let me explain why.

10         First, this is a case in which the Government may

11  properly seek detention and, as discussed, there is a

12  rebuttable presumption of detention that arises because of the

13  nature of the offense here.

14         I do not believe that risk of flight is a serious

15  issue in this case but my finding is that the Defendant has

16  not sufficiently rebutted the presumption as to danger to the

17  community in this matter.

18         Specifically, I am relying upon the following and it

19  really is all pertaining to the nature and circumstances of

20  the instant offense because this is an extremely serious

21  offense involving serious abuse perpetrated online to a very

22  significant number of victims according not only to the

23  findings by the Government but the Defendant's statement about

24  the number of children with whom he was interacting online.

25         This is conduct that is especially difficult to

1    monitor and while I do appreciate the family's willingness to

2    assist in attempting to monitor the conduct, that the conduct

3    here is extremely difficult to monitor.  It is not something

4    where electronic home monitoring really can achieve what needs

5    to be achieved in this case because there was no involvement.

6              I mean in some ways it -- understanding

7    Mr. Szekely's point that some aggravating circumstances such

8    as travel to try to meet children is not involved, in some

9    ways the very nature of the conduct here is such that it can

10   be entirely committed from within a particular residence

11   without movement and so that makes it very difficult to

12   monitor.

13             So given the presumption in this case, Pretrial

14   Service's recommendation of detention and the nature of the

15   conduct, I do believe this is a case in which an order of

16   detention is appropriate.

17             Is there anything else that we can address in this

18   matter today?

19             MR. IZANT:  Nothing further as far as the Government

20   is concerned.

21             THE COURT:  Mr. Szekely?

22             MR. SZEKELY:  Your Honor, I do have a medical -- a

23   communication of medical needs form.

24             THE COURT:  Okay.

25             MR. SZEKELY:  If I can bring that forward?

1           THE COURT:  You can hand that up, yes, and I will

2    give you your exhibits back and I will make sure that that

3    gets submitted.

4           MR. SZEKELY:  Your Honor, it is not clear from that

5    form.  Mr. Siddiqui was arrested wearing contacts and it is

6    starting to irritate his eyes or he cannot see without them?

7    So he has to take them out and then he is ineffectively unable

8    to see so.

9           THE COURT:  Unable to see.  All right.  We will make

10   sure that that gets submitted to the Marshall.  All right.  We

11   will make sure that that gets submitted.

12           Is there anything else that we need to address

13   today?  Anything else from the Government, Mr. Izant?

14           MR. IZANT:  No, nothing further, Your Honor.

15           THE COURT:  All right.  Thank you.

16           THE CLERK:  All rise.  This Honorable Court now

17   stands in recess.

18        (Whereupon, at 10:39 a.m., the proceedings concluded.)

19

20

21

22

23

24

25

dmh

## C E R T I F I C A T E

I certify that the foregoing is a correct transcript from the

duplicated electronic sound recording of the proceedings in

the above-entitled matter.


*Doreen Hodder*   10-22-18
_____
Doreen Hodder          Date
Transcriber