IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | CRIMINAL NO. CCB-19-0322 |
| | * | |
| BILAL MOHAMMAD SIDDIQUI, | * | |
| | * | |
| Defendant. | * | |
| | ****** | |

# GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America respectfully submits the following memorandum in advance of sentencing in the above-captioned case, which is scheduled for Thursday, October 22, 2020, at 12 p.m. For the following reasons, the government requests that the Court sentence the Defendant to 324 months' (*i.e.*, 27 years') imprisonment, to be followed by lifetime supervised release.

## I.   Background

Between April 2017 and September 2018, the Defendant, Bilal Mohammad Siddiqui, used social media applications and other mobile communication tools to entice and coerce, by his own admission, somewhere between 10 and 50 minor females into producing and sending him images and videos of themselves engaging in various demeaning sex acts. The government later identified at least seven of these children, who were between 8 and 14 years old at the time they were abused by the Defendant. During this period of time, the Defendant also used the explicit images and video produced by one of the victims, an 11-year-old girl, to extort her into producing even more demeaning sexual abuse material. Although the 11-year-old initially yielded to his threats, when she later tried to resist the Defendant's demands for additional images and videos, the Defendant sent the images and videos to her sixth-grade classmates.

Following a tip to law enforcement, the Defendant was eventually identified and arrested pursuant to a federal criminal complaint on September 27, 2018. On October 18, 2019, the Defendant pleaded guilty to a three-count information charging him, in Counts One and Two, with sexual exploitation of minors, in violation of 18 U.S.C. § 2251(a); and, in Count Three, with cyberstalking, in violation of 18 U.S.C. § 2261A(2)(B). The Defendant entered his plea pursuant to an agreement in which the government agreed, among other things, to recommend a sentence of not more than 360 months' imprisonment pursuant to Federal Rule of Criminal Procedure 11(c)(1)(B). *See* Plea Agreement ¶ 9, ECF 38-1. Consistent with that agreement, the government now asks the Court to sentence the Defendant to a below-guidelines term of 324 months' (*i.e.*, 27 years') imprisonment and lifetime supervised release. In light of the Defendant's reprehensible conduct, no lesser term of imprisonment sufficiently accounts for the sentencing factors the Court is required to consider under 18 U.S.C. § 3553(a).

## II. <u>Sentencing Framework</u>

The Defendant's convictions on Counts One and Two are each punishable by a mandatory minimum term of 15 years' imprisonment, and a maximum term of 30 years' imprisonment, *see* 18 U.S.C. § 2251(a), (e); and require the Court to impose a mandatory minimum 5-year term of supervised release, with a maximum term of lifetime supervised release, *see id.* § 3583(k). The Defendant's conviction on Count Three is punishable by a maximum term of 5 years' imprisonment, *see id.* § 2261(b)(5); and authorizes a maximum term of supervised release of 3 years, *see id.* §§ 3559(a), 3583(b)(2).[1]

---

[1] Although the maximum fine for each Count is $250,000, *see* 18 U.S.C. § 3571(b), the government is not seeking the imposition of any fine because it appears, based on the analysis conducted by the United States Probation Office, that the Defendant does not have the ability to pay one, *see* Presentence Investigation Report ¶ 129, ECF 45. For the same reason, the government will not request that the Court impose the $5,000 special assessment established in 18 U.S.C. § 3014(a) that would otherwise apply to the Defendant's convictions on Counts One and Two.

In calculating the advisory guidelines range, Paragraph 6 of the Defendant's Plea Agreement is consistent with the analysis set forth in Part A of the Presentence Investigation Report ("PSR") prepared by the United States Probation Office, *see* PSR ¶¶ 40–96, ECF 45. Although the Defendant's total offense level is 51, the parties and the Probation Office agree that the Defendant's total offense level is "treated as" 43, since this is one of the "rare cases" where application of the guidelines results in a total offense level greater than 43. U.S.S.G. Ch. 5, Pt. A, cmt. n.2; *accord* Plea Agreement ¶6(oo); PSR ¶ 96. Because the Defendant is in criminal history category I, *see* PSR ¶ 100, the resulting guidelines sentence would otherwise be life imprisonment, *see id.*; *see also* U.S.S.G. Ch. 5, Pt. A. A life sentence, however, would exceed the maximum term authorized by statute. Accordingly, the final guidelines sentence is the statutory maximum—780 months' (*i.e.*, 65 years') imprisonment. *See* U.S.S.G. §5G1.2(b), cmt. n.3(B); *see also* PSR ¶ 131. As for supervised release, the guidelines range on both Counts One and Two is between five years and life, *see* PSR ¶ 91 (citing U.S.S.G. §5D1.2(b)(2)); and on Count Three, the range is between 1 and 3 years, *see id.* (citing U.S.S.G. §5D1.2(a)(2)).

### III.    Section 3553(a) Analysis

The Defendant admitted to sexually exploiting between 10 and 50 minor females, including multiple prepubescent children; he *physically* abused some of them remotely; and then he publicly victimized an 11-year-old by extorting her into engaging in more physical abuse before distributing depictions of that abuse to her peers. In light of the sentencing factors the Court must consider under 18 U.S.C. § 3553(a), the Defendant's conduct and character amply justify a 27-year term of imprisonment.

### A. Nature and Circumstances of the Offense

The nature and circumstances of the Defendant's atrocious conduct reflect numerous aggravating circumstances that warrant the imposition of a significant sentence. *See* 18 U.S.C. § 3553(a)(1).[2]

#### 1. The Defendant Exploited Numerous Victims Over a Lengthy Period

First, the Defendant's convictions did not result from an isolated incident, nor was his conduct confined to the distant past. The Defendant sexually exploited numerous prepubescent and pubescent minor females, on multiple occasions throughout an 18-month period, and his conduct continued up until just two days before he was arrested. *See* Plea Agreement, Attachment A ("Statement of Facts") at 2. The Defendant sexually exploited so many children over such a lengthy period of time that the best estimate he could provide to law enforcement was that he had caused somewhere between 10 and 50 minors "to do sexual things on video." *Id.* at 3. By the time the Defendant entered his plea on October 18, 2019, the government had identified and contacted at least six victims, who are the minor females identified in the Statement of Facts as Jane Does 1, 2, 3, 4, 5, and 6. One of the victims, Jane Doe 6, had been exploited by the Defendant for nearly a year. And, with the exception of Jane Doe 5, the Defendant coerced all of the victims to produce multiple images and videos of themselves engaging in sexually explicit conduct. For example, the Defendant told investigators that he produced as many as 10 separate videos of Jane Doe 2 alone. *See id.* at 2.

During the course of exchanging discovery with substitute defense counsel, moreover, the government later identified a seventh potential victim—Jane Doe 7—when reviewing data

---

[2] This memorandum does not describe entirety of the Defendant's conduct. For a more detailed description of the Defendant's offenses, the government respectfully refers the Court to the Statement of Facts attached to the Plea Agreement, including Attachments A-1 and A-2. *See* Plea Agreement at 16–26, ECF 38-1.

recovered from the Defendant's iPhone. At the time she was victimized by the Defendant in August 2018, Jane Doe 7 stated that she was a 13-year-old female living in Washington state. The Defendant first contacted Jane Doe 7 on LiveMe and began communicating with her through the application's private messaging function. After Jane Doe 7 told the Defendant that she was 13 years old, and the Defendant told her that he was 13, too—an assertion the Defendant supported by sending Jane Doe 7 a photograph of a younger-looking boy. The Defendant then convinced Jane Doe 7 to move their communication from LiveMe to SMS/MMS messaging, through which the Defendant ultimately persuaded Jane Doe 7 to engage in sexually explicit conduct—enabling the Defendant to produce both photographic and video depictions of Jane Doe 7.

Accordingly, had its investigation continued, the government would have identified additional victims (or intended victims) of the Defendant. This conclusion derives from the circumstances through which the government identified Jane Doe 7, as well as the Defendant's own admission to having sexually exploited between 10 and 50 children. It is also supported by records that investigators obtained from the Defendant's Snapchat account. Those records revealed the Defendant's communication with numerous apparent minors on Snapchat, where the Defendant initiated sex-related conversations and solicited materials depicting sexually explicit conduct. And the likelihood of additional victims is further established by investigators' review of the Defendant's digital devices, which contained photographs and images of minor females who either could not be identified or were not—in the materials that were recovered—depicted engaging in sexually explicit conduct.

2. <u>The Defendant Exploited Young Children Throughout the Country</u>

<u>Second</u>, the Defendant used social media applications and other mobile communication tools to sexually exploit children who were especially young and, therefore, vulnerable; and his abhorrent conduct victimized children all over the United States.

- Jane Doe 1, of Texas, was an 8-year-old prepubescent female who told the Defendant that she was 13 years old at the time he exploited her.[3] The Defendant used LiveMe, FaceTime, and SMS/MMS messages to entice Jane Doe 1 to engage in sexually explicit conduct, which the Defendant captured in both images and videos.

- Jane Doe 2, of North Carolina, was a 9-year-old prepubescent female, who the Defendant believed was 11 or 12 years old at the time he exploited her. The Defendant used Snapchat to entice Jane Doe 2 to engage in sexually explicit conduct, which the Defendant captured in multiple videos.

- Jane Doe 3, of Wisconsin, was an 11-year-old prepubescent female who told the Defendant that she was 12 years old at the time he exploited her. The Defendant used Snapchat to entice Jane Doe 2 to engage in sexually explicit conduct, which the Defendant captured in multiple images.

- Jane Doe 4, of South Carolina, was an 11-year-old prepubescent female who told the Defendant that she was 14 years old at the time he exploited her. The Defendant used LiveMe, Snapchat, Kik, FaceTime, and SMS/MMS messaging to coerce Jane Doe 4 to engage in sexually explicit conduct, which the Defendant captured in both images and videos.

- Jane Doe 5, of Ohio, was a 12-year-old female who told the Defendant that she was 12 years old at the time he exploited her. The Defendant used Snapchat and Kik to entice Jane Doe 5 to engage in sexually explicit conduct, which the Defendant captured on video.

- Jane Doe 6, of Texas, was a 14 year-old female who told the Defendant that she was 14 years old at the time he exploited her. The Defendant used Snapchat and Kik to entice Jane Doe 6 to engage in sexually explicit conduct, which the Defendant captured in both images and video.

- Jane Doe 7, of Washington, told the Defendant that she was 13 years old at the time he exploited her. The Defendant used LiveMe, Snapchat, and SMS/MMS messaging to entice Jane Doe 7 to engage in sexually explicit conduct, which the Defendant captured in multiple images.

---

[3] Jane Doe 1's physical appearance was far more consistent with an 8-year-old's than a 13-year-old's.

### 3. The Defendant's Abuse of Certain Victims Was Particularly Cruel

Third, much of the sexually explicit conduct the Defendant caused these children to engage in was particularly demeaning and sadistic.

- The Defendant enticed Jane Doe 1, *an 8-year-old*, to use a marker to write "BILAL," the Defendant's first name, on the skin next to her genitalia. The Defendant also persuaded Jane Doe 1 to use FaceTime to capture herself using the bathroom so that he could watch her urinate.

- The Defendant likewise enticed Jane Doe 2, a *9-year-old*, to use a marker to write "BILAL" on her pubic area. The Defendant also persuaded Jane Doe 2 to insert a hairbrush into her vagina.

- The Defendant coerced Jane Doe 4, *an 11-year-old*, into "deepthroat[ing]" a toothbrush and a hairbrush and then shoving both "as far down" into her vagina as they would go. The Defendant also forced Jane Doe 4 to expose her anus to him and to record herself "calling yourself a dumb slut that wants to gag on my dick." Statement of Facts, Attachment A-1 at 4, Attachment A-2 at 2.

### 4. The Defendant's Behavior Was Methodological and Willful

Fourth, the Defendant's repugnant behavior was not attributable to youthful indiscretion or a perverted form of experimentation with online anonymity. The Defendant's conduct was methodological and willful. An undergraduate enrolled in the information systems department at the University of Maryland, Baltimore County, the Defendant was an educated user of internet-based communication tools. He stalked children on social media platforms like LiveMe, which were designed for users to widely share their identities with the public. The Defendant then systematically used these applications' direct messaging functions to persuade the children he found to communicate with him on more anonymous applications, like Kik, or to use completely private tools like SMS/MMS messaging, where the Defendant's messages could be encrypted and the child exploitation materials he produced would be removed from remote computer servers accessible by corporations or law enforcement. Knowing that he could not otherwise gain access

to children, the Defendant hid his true identity by creating fake social media profiles and lying to the victims about who he was.

- The Defendant told Jane Doe 2, a 9-year-old who claimed to be 14, that he was 16 years old.

- The Defendant told Jane Doe 3, an 11-year-old, that he was 12.

- The Defendant told Jane Doe 4, an 11-year-old who claimed to be 14, that he was 15 years old and lived in South Carolina, too.

- The Defendant told Jane Doe 5, who truthfully disclosed that she was 12, that he was 13 years old.

- The Defendant initially tried to contact Jane Doe 6, who truthfully disclosed that she was 14, through his Snapchat username "bilal.sidd." When Jane Doe 6 blocked "bilal.sidd," the Defendant successfully contacted her as 13-year-old "brody_venzitto."

- The Defendant told Jane Doe 7, whom investigators believe was 13 years old, that he was 13, too, and lived in Florida, "on the other side of America," where, the Defendant told Jane Doe 7, "no one will know" that she sent him photographs or videos of herself engaging in sexual conduct.

And the Defendant tried to cover his tracks, albeit inconsistently. After the Defendant exploited Jane Doe 1, he instructed her to delete the pictures and their conversation—and Jane Doe 1 complied. Similarly, after exploiting Jane Doe 6 for nearly a year, the Defendant told her that he needed to "delete everything." Statement of Facts at 4. The Defendant plainly was aware that what he was doing with these children was wrong. But he continued exploiting them anyway.

### 5. The Defendant's Exploitation of Jane Doe 4 Was Especially Odious

Fifth, the Defendant's abuse of Jane Doe 4, in particular, was extraordinarily disturbing and malicious. The Defendant did not just entice Jane Doe 4 to engage in sexually explicit conduct, on several occasions, so that he could produce multiple visual depictions of that conduct; the Defendant used those depictions to *extort* Jane Doe 4 into engaging in more sadistic and demeaning behavior, more frequently, in order to gratify himself sexually. Worst of all, even when Jane Doe 4

tried to submit to his vile demands, the Defendant nonetheless disseminated photographic and video depictions of his abuse of Jane Doe 4 to her sixth-grade classmates.

Unlike the Defendant's enticement of most of his other victims, whom the Defendant sexually exploited almost instantly or during just a few days, the Defendant groomed Jane Doe 4 over the course of several weeks. The Defendant convinced Jane Doe 4 that he was her same age and lived in the same town, and—within a week—had caused Jane Doe 4 to believe they were in a romantic relationship, making Jane Doe 4 comfortable enough to reveal the name of the middle school she attended. The Defendant then exploited both facts to expand his abuse of Jane Doe 4.

Having persuaded her that she was in a genuine relationship with him, the Defendant enticed Jane Doe 4 to send him at least one video of herself engaging in sexually explicit conduct. The Defendant then betrayed Jane Doe 4's trust in him by threatening to send the video "to your friends and wh[o]le school" if she did not submit to the Defendant's demands for recordings of even more extreme child exploitation material. Statement of Facts, Attachment A-1 at 1. The Defendant demanded that Jane Doe 4 "[o]pen your pussy with your fingers" and "[o]pen your pussy wide" to produce another video for him, *id.* at 2, or he would "expose u [right now] and ruin your life," *id.* at 3. But even when Jane Doe 4 complied with his instructions, the Defendant's demands became even more abusive. The Defendant instructed Jane Doe 4, "Deepthroat that toothbrush for 30 seconds and the hairbrush for 30 seconds and then . . . stick both in your pussy," and told her, "If u don't try shoving it back as far I'll expose . . . Shove both as hard in your mouth and in pussy . . . The whole video sent has to be 1 minute . . . If u don't shove it down your mouth and pussy as far down exposed." *Id.* at 4.

A few days later, when Jane Doe 4 tried to end the relationship, the Defendant responded by extorting her to provide him with still more extreme videos of herself engaging in sexually

9

explicit conduct. The Defendant demanded that Jane Doe 4 send him one-minute videos "of you putting the brush in your pussy and another of you opening your ass," adding, "I want to see your ass hole and then put the brush in. I want to rub my dick to it. If I don't get these videos in 5 [minutes] I'm gunna ask for 3 videos." Statement of Facts, Attachment A-2 at 1. The Defendant explained, "I know you're still going to send the videos because I'll expose u to everyone . . . Family and friends . . . Send the videos right now." *Id.* When Jane Doe 4 asked the Defendant to wait because her phone was charging, the Defendant told her, "I don't give a fuck! Send it in 3 minutes or I'll send it to your teachers . . . I know the school u goto [sic]." *Id.* And even though Jane Doe 4 stated that she would produce the videos the Defendant demanded later that night, the Defendant told her, "Too late I don't want it anymore . . . I'm sending to everyone I'm sick of your fake shit . . . Bye and let's see how things go now." *Id.* at 2. Within hours, the Defendant sent a photograph and two videos depicting the sexual exploitation of Jane Doe 4 to at least two of her middle school classmates.  Within a few days, another sixth-grader reported to school administrators that several classmates were circulating child exploitation material depicting Jane Doe 4 in a group conversation on Snapchat. Accordingly, the Defendant achieved his perverted goal of publicly "expos[ing]" Jane Doe 4 to "ruin [her] life" for the transgression of failing to immediately succumb to his abuse. Statement of Facts, Attachment A-2 at 3.

      Moreover, as reprehensible as the Defendant's extortion of Jane Doe 4 was, the degrading manner in which the Defendant carried it out reflects even more poorly on his character. When Jane Doe 4 tried to push back against the Defendant's demands, he told the sixth grader, "Your [sic] dumb as f[uck] . . . You talk way too much." Statement of Facts, Attachment A-1 at 2. Although Jane Doe 4 tried to explain that she had been unable to immediately comply with the Defendant's demands because she had been menstruating, the Defendant told her, "Idc"—an

10

abbreviation for "I don't care."  Statement of Facts, Attachment A-2 at 1.  When Jane Doe 4 warned the Defendant that her mother could read the messages the Defendant sent her, he told her, "I don't care . . . I'll ask to see her pussy as well."  *Id.* at 2.  Pointing out that "[s]omebody told me not to go with u but I didn't listen," Jane Doe 4 asked the Defendant, "Why u treat me like this?"  Within seconds, the Defendant responded, callously, "U did this to yourself."  *Id.*

6. <u>The Danger Posed by the Defendant Is Not Diminished Online</u>

<u>Sixth</u>, the Defendant's behavior is not mitigated—as the defense has previously suggested to government counsel—by the assertion that the Defendant's conduct did not constitute any so-called "hands-on" offense.  The Defendant enticed Jane Doe 2, a 9-year-old, to insert a hairbrush into her vagina.  And the Defendant coerced Jane Doe 4, an 11-year-old, to "deepthroat" a toothbrush and a hairbrush and, then, to shove both "as far back" into her vagina as she could.  For these victims, the Defendant's conduct *did* result in physical abuse.

Nor is it true that the Defendant is necessarily less dangerous to the public because he did not travel to meet any of his victims in person.  An offender who exploits children in person can only be in one place at one time.  An in-person offender can be surveilled and identified.  Without infinite resources, an in-person offender can only travel so far, for so long.  Online predators, by contrast, can sexually exploit children who live all over the country, like this Defendant did.  Online predators can abuse multiple children at once—as illustrated by this Defendant, who, during at least one day in September 2017, was simultaneously sexually exploiting Jane Doe 1, Jane Doe 4, and Jane Doe 6.  And online predators can, like this Defendant did for almost 18 months, hide their conduct through encryption and fake identities.

In any event, the distinction between in-person offenders and online predators is beside the point.  The *harm* suffered by each victim is the same.  As one expert has explained, "Even though

11

they haven't been touched, the trauma level we see is as severe as hands-on offenses, because a lot of these kids don't know how to end what can go on, sometimes, for years. And they think it's not happening to anyone else." Benjamin Wittes *et al.*, *Sextortion: Cybersecurity, Teenagers, and Remote Sexual Assault*, Center for Technology Innovation at Brookings, 23 (2016), available at https://www.brookings.edu/wp-content/uploads/2016/05/sextortion1-1.pdf.

### B. History and Characteristics of the Defendant

The Defendant's history and characteristics, too, support the government's requested sentence. *See* 18 U.S.C. § 3553(a)(1).

Insofar as the Defendant emphasizes his lack of criminal history to minimize the danger he poses to the public, the observation overlooks the nature of the Defendant's conduct. The Defendant did not commit just one offense at a singular point in time. He sexually exploited somewhere between 10 and 50 children over the course of nearly 18 months. As the guidelines calculation reflects, the Defendant is not, in fact, a first-time offender. He truly is a repeat and dangerous sex offender against minors. *See* PSR ¶ 93 (citing U.S.S.G. §4B1.5).

Nor do the Defendant's background and age mitigate his conduct. Unlike most federal sex offenders, the Defendant had "a relatively normal childhood," without "any significant hardships." PSR at 23. To be sure, having sexually exploited his victims at a time when he was approximately 21 years old, the Defendant—now 23—is younger than most sex offenders convicted in the District of Maryland. But while the Defendant was younger than most sex offenders, so, too, were the Defendant's victims, who—at the time they were sexually exploited by the Defendant—were as young as 8 or 9 years old. Of course, the Defendant could not have failed to appreciate just how young these victims were. At the very same time he was exploiting these young children, the Defendant was living with his 11-year-old sister. And to the extent that a sex offender's risk of

12

recidivism decreases with age, the Defendant's relatively young age makes him more dangerous to the public—not less.

Finally, in evaluating the Defendant's history and characteristics, the Court should not isolate other parts of the Defendant's life from his conduct in this case. The Defendant's horrific behavior is itself demonstrative of his character. The government submits that the best measure of the Defendant's—or any person's—character is not what he did when other people were paying attention. Rather, the best measure is how the Defendant comported himself when he believed that no one was watching. And when the Defendant here believed that he could act with complete anonymity online, he used the opportunity to sexually exploit vulnerable minors, including prepubescent children. That—more than anything else—reflects the Defendant's true character.

### C. Need to Reflect the Seriousness of the Offense, Promote Respect for the Law, and to Provide Just Punishment

The need for the sentence imposed to reflect the seriousness of the Defendant's offenses, promote respect for the law, and provide just punishment likewise warrants the significant term of 27 years' imprisonment. *See* 18 U.S.C. § 3553(a)(2)(A).

The Defendant's crimes were beyond serious. The Defendant used social media to sexually exploit between 10 and 50 minors located throughout the United States, and some as young as prepubescent 8 and 9-year-olds. The Defendant's exploitation included enticing certain victims to participate in remote physical abuse involving demeaning sex acts. And, for his own sexual gratification, the Defendant used threats to coerce an 11-year-old victim to film herself engaging in demeaning physical abuse and then sent the videos of her being exploited to her sixth-grade classmates. Few prosecutions involving the online exploitation of children are more serious than this one. Accordingly, a mandatory-minimum sentence would not promote respect for law.

The seriousness of the Defendant's conduct is also underscored by its effect on his victims, and it is not difficult to imagine what those effects were. It would be utterly mortifying to discover that documentation of such personal physical abuse had fallen into the hands of an online predator like the Defendant. Children exploited in abuse materials like these "must live with the permanency, longevity, and circulation of such a record of their sexual victimization. This often creates lasting psychological damage to the child, including disruptions in sexual development, self-image, and developing trusting relationships with others in the future." U.S. Dep't of Justice, *Nat'l Strategy for Child Exploitation Prevention and Interdiction: A Report to Congress*, 72 (2016), *available at* https://www.justice.gov/psc/file/842411/download. In addition to the *private* distress that each of the Defendant's victims surely experienced, Jane Doe 4 also endured extreme *public* humiliation as a result of the Defendant's unconscionable behavior. It will take no small act of heroism for this 11-year-old to recover from the obvious trauma caused by the Defendant's distribution of images of her sexual exploitation to her peers.

The Defendant's victimization of these children, moreover, had damaging effects on their families, too. Jane Doe 2, for example, told law enforcement that she was afraid of suffering domestic abuse—specifically, a whooping—when her mother learned about her involvement in the Defendant's crimes. Jane Doe 3 provided an even more horrifying description of what happened when her communication with the Defendant was revealed to her family. According to a partial preliminary transcript of her interview with law enforcement, Jane Doe 3 described the events as follows:

> [S]o once that all happened . . . and then about a hour later . . . my mom came up and she [said] what's this . . . because she had a computer . . . and I said [a friend's name]. She told me to watch it so the cops were called and [the friend's] parents were contacted and then a cop came over. Ah, well and this . . . um . . . this is where it gets emotional . . . um . . . this is where my dad and I (*voice cracking*)

14

started fighting a lot (*sniffs*) and we've always fought but it wasn't like that . . . so what he did was he looked at me . . . he said go upstairs on the count of three or I'm gonna strangle you (*begins to cry*) so I went upstairs and I locked my door and I put my dresser in front of it 'cause he's a big guy and he was strong 'cause he had punched a hole through my other door when I lived at my old house. So I told him . . . and . . . or well . . . he saw me looking out the window 'cause he was outside standing in the road with his arms in the air (*crying*) and then he smashed his phone. Like he took it and he bashed it on the ground 'til it was broken and then he grabbed a hammer and a crowbar . . . started beating his truck (*crying*) and then he saw me looking out the window. He said get in there before I kill you with this and he yelled [unintelligible ("U/I")] and then I did. [U/I] my mom. I said mom, dad is gonna kill me. She goes no he's not. (*Crying*) No, he's not. Just go lock yourself in your room and [U/I] in case and so I did and my brother (*sighs*) . . . my    brother . . . he was screaming and crying. He goes I don't want you to die. I don't want you to die. So he said I'll be okay. If he does anything, I promise I'll fight and I'll fight and I'll fight (*sniffs*) and so I went upstairs in my room and my brother and I were talking through the vent because the vent from the downstairs basement leads up to my room.

So we were talking through to the vent . . . just telling each other how much we love each other and no matter what happens, I'll be okay. And then once the cops came, they saw dad outside in the road and they got him to the side of the road and then the cops came up in my room so I had to move everything back and then they . . . I had to tell the story (*sniffs*) and then he . . . he told me you should never do that again even if you are an adult or a teenager because there was a girl who sent pics to her boyfriend, as well, and he leaked them out on the Internet and she killed herself 'cause of harassment and I said I'm not gonna kill myself and I promise I won't do it ever again and he looked me in the eyes and he said be careful with what you do and I really took that into consideration . . . .

[T]hen ah . . . my dad came into my room and he looked at me straight tin the eyes and said [Jane Doe 3], I'm pissed at you and that's all he said. I'm sorry about my language. I'm not really allowed to say that or anything but I'm just telling you his words. He looked at me and said you won't forget this moment and I didn't because he didn't talk to me for four months. (*Crying*) I told . . . tell him I love you and he'd turn around (*sniffs*) and go away and then I'd try to give him a hug and he would push me away and that happened for four months and then one day he finally said I love you. (*Crying*) I said I love you too. We had really made [sic] conversation about how that really affected our relationship (*sniffs*)

15

and that's when things really got rocky with him and my mom as well. Because about what . . . after that, they threatened to break-up because my dad . . . some lady had sent him pics, as well. My dad [U/I] back but my dad started heroin and was stealing money from me and my brother and we just thought . . . he told us it was for gas and for food. It was for heroin (*sniffs*) and that's why we're currently living with my grandma because we can't afford the house right now because of everything.

### D. Need to Protect the Public from Further Crimes of the Defendant

The need to protect the public from further crimes of the Defendant makes the imposition of the government's requested sentence critical. *See* 18 U.S.C. § 3553(a)(2)(C).

At the moment of his arrest in this case, the Defendant represented a serious threat to children everywhere. There is absolutely no reason to believe the Defendant would have stopped exploiting minors online had he not been apprehended. By that time, the Defendant had been engaged in the sexual exploitation of children on numerous occasions for nearly 18 months, and his behavior continued until as recently as days before his arrest. *See* Statement of Facts at 2.

Insofar as the risk of recidivism declines with age, the fact that the Defendant is in his early twenties also makes him more—rather than less—dangerous to the public. That danger, moreover, is only exacerbated by the fact that the Defendant has, despite his age, already established himself as a repeat and dangerous sex offender against children. Nor is the Defendant's status as a repeat and dangerous sex offender surprising, given the nature of his appalling conduct. Research demonstrates that so-called "sextortionists," like the Defendant, tend to be "prolific repeat players." Wittes *et al.*, *Sextortion: Cybersecurity, Teenagers, and Remote Sexual Assault*, at 4. A 2016 analysis of "sextortion" cases in the United States revealed 25 cases involving at least 10 victims, 13 cases involving at least 20 victims, and 4 cases involving more than 100 victims. *See id.* ("The numbers get far worse if you consider prosecutorial estimates of the number of additional victims in each case, rather than the number of specifically identified victims. In 13 cases,

prosecutors estimated that there were more than 100 victims; in two, prosecutors estimated that there had been 'hundreds, if not thousands' of victims.").

Unless the Defendant is sentenced to a term of imprisonment that results in his incarceration until he nears the age of 50, the Defendant's risk of recidivism will not have materially diminished. Nor are conditions of supervised release an alternative to imprisonment that will adequately mitigate that risk. It is critical that the Probation Office be authorized to install computer monitoring software and that the Defendant be subject to unannounced computer searches. *See* PSR at 24. But, given the "ready accessibility of smart phones and digital communication devices," it will be "all too easy" for the Defendant to resume his sexual exploitation of children online. *United States v. Martin*, No. PWG-19-140-13, 2020 WL 1274857, at *4 (D. Md. Mar. 17, 2020).

### E. Need to Afford Adequate Deterrence to Criminal Conduct

Finally, just as the Court's sentence must protect the public from further crimes by this Defendant, it is equally critical for the Court's sentence to afford adequate deterrence to similar criminal conduct by others. *See* 18 U.S.C. § 3553(a)(2)(B). A 27-year sentence would accomplish that result, but a mandatory minimum sentence would not.

Online exploitation represents, as a general matter, an ever-expanding danger to children and families. Social media platforms and other technology have "made it easier for predators to get our kids faster and more efficiently," and make children even more vulnerable by "normalizing communication with strangers." Nellie Bowles & Michael H. Keller, *Video Games and Online Chats Are "Hunting Grounds" for Sexual Predators*," N.Y. Times (Dec. 7, 2019), https://www.nytimes.com/interactive/2019/12/07/us/video-games-child-sex-abuse.html. However, the particular type of exploitation the Defendant engaged in here, sextortion, is "by far the most significantly growing threat to children." *Nat'l Strategy for Child Exploitation*

17

*Prevention and Interdiction* at 75. The Defendant's shocking behavior here, moreover, is consistent with this trend, because "[s]extortion cases tend to have more minor victims per offender than all other child sexual exploitation offenses." *Id.* The unfortunate reality is that "it is becoming common for investigations to reveal that a single sextortion offender has been communicating with hundreds of potential victims." *Id.*; *see also id.* (reporting that "[f]orensic examinations of sextortion offenders' digital media commonly reveal thousands of organized folders containing videos and documentation of their contact with countless minors, often around the world"). And sextortion is so pernicious and intractable because these offenders, like the Defendant, take advantage of the fact that victims, like Jane Doe 3 or Jane Doe 4, for example, expose themselves to deep shame and embarrassment simply by reporting their victimization.

Accordingly, deterring sextortion is essential for the simple reason that the danger it poses to children is rising more quickly than any other threat. But deterring sextortionists like the Defendant is important for other reasons, too. Insofar as the government relies on private institutions like schools to protect children, this prosecution illustrates that institutions themselves can fail. When middle school administrators interviewed Jane Doe 4 about the exploitation material that sixth graders were sharing on Snapchat, Jane Doe 4 told administrators exactly what happened—that her "boyfriend" sent the images to her classmates because she refused to send more nude photos of herself to him. But school administrators never contacted police to report the incident. *See* Statement of Facts at 4. It is highly likely that, had law enforcement learned about the Defendant's conduct in October 2017, the Defendant could have been apprehended almost a year earlier than he ultimately was, which could have averted the exploitation of any children that he victimized over the ensuing year.

18

The Defendant's conduct here also demonstrates that better educating children about online threats does not adequately compensate for institutional failures like the one Jane Doe 4 experienced. For example, when the Defendant began communicating with Jane Doe 6 on Snapchat, she initially treated him with the appropriate degree of caution, questioning why she could not find his profile name on other social media platforms. Jane Doe 6 even explained that she did not want to be talking to someone "who might be a danger" to her. *Id.* Even that level of awareness, however, was insufficient to avoid victimization by the Defendant. The Defendant ultimately persuaded Jane Doe 6 to trust him and, eventually, enticed her to send him images and videos depicting herself engaged in sexually explicit conduct.

### IV. Conclusion

Accordingly, for the foregoing reasons, the government requests that the Court sentence the Defendant to 324 months' (*i.e.*, 27 years') imprisonment and lifetime supervised release.

Respectfully submitted,

Robert K. Hur
United States Attorney

By: _____
Jeffrey J. Izant
Paul E. Budlow
Assistant United States Attorneys